

Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BARBARA WOLFSON, derivatively on behalf of Nominal Defendant ALLBIRDS, INC., | Civil Action No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| JOSEPH ZWILLINGER, NEIL BLUMENTHAL, DICK BOYCE, TIMOTHY BROWN, MANDY FIELDS, DAN LEVITAN, and ANN FREEMAN, | |
| Defendants, | |
| and | |
| ALLBIRDS, INC., | |
| Nominal Defendant. | |

Plaintiff Barbara Wolfson, by her undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Allbirds, Inc. ("Allbirds" or the "Company") against the members of the Company's Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders.  These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other

things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Allbirds conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

**I.      NATURE OF THE ACTION**

1.      This is a stockholder derivative action brought against the members of the Allbirds Board for their breaches of fiduciary duty, violations of the federal securities laws, and other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.      On March 9, 2023, the Company disclosed a net loss of over $100 million for 2022, reflecting gross profit margin decline of more than 9% from the previous year, and that it missed previously given financial guidance. Defendant Joseph Zwillinger, Allbirds' CEO, admitted that the Company "overemphasized products that extended beyond our core DNA," and that "[b]ecause we were spending significant time and resources on these products that did not resonate well, we underinvested in our core consumers' favorite products," despite the Company, and certain of its directors and officers, having made repeated representations to the contrary in publicly filed documents and in conference calls with financial analysts and investors.

3.      Following the announcement of the Company's financial results, Allbirds' stock dropped by 47% in one day. In the wake of that massive stock drop, two securities class actions were filed against the Company and certain of its directors and officers. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, as well as its directors and officers.

4.      As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Allbirds has sustained substantial damage and irreparable injury to its reputation. Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control weaknesses that afflict Allbirds.

5.      Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Allbirds will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.      JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and Section 21D of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

7.      This Court has jurisdiction over each Defendant named herein because Allbirds maintains its headquarters and does substantial business in this District and, as such, each Defendant is an individual or corporation with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

8.      This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

## III.     PARTIES

### A.      Plaintiff

10.     Plaintiff Barbara Wolfson purchased Allbirds stock in the Company's IPO and has held Allbirds common stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

**B.** **Defendants**

**Nominal Defendant Allbirds, Inc.**

11.     Nominal defendant Allbirds, Inc. ("Allbirds") is a Delaware corporation with its principal executive offices located at 730 Montgomery Street, San Francisco, CA 94111.  The Company's common stock trades on the Nasdaq stock exchange under the symbol "BIRD."

**Individual Defendants**

12.     Defendant Joseph Zwillinger ("Zwillinger") is the Co-Founder of Allbirds, Chief Executive Officer ("CEO") since May 4, 2023, and President and an Allbirds director since the Company's inception.  Zwillinger also served as Co-CEO from October 2015 until May 4, 2023.  As of March 31,2023, Zwillinger owns 12,810,945 Allbirds Class B[1] common stock shares and holds 19.9% of the Company's total voting power.  Since 2021, Zwillinger received the following compensation:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|---|---|
| 2022 | $365,462 | $2,012,471 | $2,059,226 | N/A | $12,051 | $4,449,210 |
| 2021 | $297,596 | N/A | N/A | $83,327 | $11,904 | $392,827 |

13.     Defendant Neil Blumenthal ("Blumenthal") is an Allbirds director since 2018 and a member of the Compensation and Leadership Management Committee (the "Compensation Committee").  As of March 31, 2023, Blumenthal owns 153,105 Allbirds Class B common stock shares.  In 2022, Blumenthal received the following compensation:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|
| $42,500 | $149,996 | $192,496 |

14.     Defendant Dick Boyce ("Boyce") is an Allbirds Director since 2016 and a member of the Audit Committee and Sustainability, Nomination, and Governance Committee.  As of March 31, 2023, Boyce owns 1,850,050 Allbirds Class B common stock shares and holds 3.0% of the Company's total voting power.  In 2022, Boyce received the following compensation:

---

[1] Each share of Allbirds Class A common stock is entitled to one vote and each share of Allbirds Class B common stock is entitled to ten votes.

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|
| $70,000 | $149,996 | $219,996 |

15.     Defendant Timothy Brown ("Brown") is the Company's Co-Founder and Chief Innovation Officer since May 4, 2023.  Brown served as Co- CEO from October 2015 until May 4, 2023, and as an Allbirds director since May 2015.  As of March 31, 2023, Brown owns 50,000 Allbirds Class A common stock shares, 13,955,925 Allbirds Class B common stock shares and holds 22.1% of total voting power.  Since 2021, Brown received the following compensation:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NON-EQUITY INCENTIVE PLAN COMPENSATION | ALL OTHER COMPENSATION | TOTAL |
|---|---|---|---|---|---|---|
| 2022 | $365,462 | $2,012,471 | $2,059,226 | N/A | $12,033 | $4,449,192 |
| 2021 | $297,596 | N/A | N/A | $83,327 | $11,904 | $392,827 |

16.     Defendant Mandy Fields ("Fields") is an Allbirds director since 2020 and is Chair of the Audit Committee.  As of March 31, 2023, Fields owns 64,583 Allbirds Class B common stock shares.  In 2022, Fields received the following compensation:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|
| $55,000 | $149,996 | $204,996 |

17.     Defendant Dan Levitan ("Levitan") is an Allbirds director since 2016, Chair of the Compensation Committee, and a member of the Audit Committee.  As of March 31, 2023, Levitan owns 75,796 Allbirds Class A common stock shares, 16,824,330 Allbirds Class B common stock shares and holds 26.9% of the Company's total voting power.  Levitan is a Managing Member of Maveron LLC ("Maveron"), a venture capital firm he co-founded in January 1998.  Maveron beneficially owns 16,824,330 Allbird Class B shares and holds 26.9% voting power.[2]  In 2022, Levitan received the following compensation:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|
| $60,000 | $149,996 | $209,996 |

---

[2] The information reflects the holdings of Maveron as of March 31, 2023.  While Defendant Levitan has control over the voting and investment power of the shares, the shares are contractually assigned to Maveron and its affiliates.  *See* the 2023 Proxy Statement pp. 37-38 nn. 1; 11.

18.     Defendant Ann Freeman ("Freeman") is an Allbirds Director since 2022, and a member of the Compensation Committee and Sustainability, Nomination, and Governance Committee.  In 2022, Freeman received the following compensation:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|
| $17,944 | $249,997 | $267,942 |

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

19.     By reason of their positions as officers and directors of Allbirds and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Allbirds and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Allbirds in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Allbirds and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

20.     The Individual Defendants, because of their positions of control and authority as directors and officers of Allbirds, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

21.     As officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq Stock Market, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Allbirds' financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to fulfill these duties, the Individual Defendants were required to exercise reasonable control and supervision over Allbirds' management, policies, and internal controls.

22.     At all times relevant hereto, the Individual Defendants were the agents of each other and Allbirds and were always acting within the course and scope of such agency.

23.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Allbirds.

### A.      Duties Under Allbirds' Code Of Business Conduct And Ethics

24.     Allbirds' Code of Business Conduct and Ethics ("Code of Conduct") applies to "every employee, officer and director of the Company."

25.     The Code of Conduct prohibits unethical and illegal practices and requires compliance with all laws and regulations applicable to Allbirds' business:

> It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner.  The Company's integrity and reputation depends on the honesty, fairness and integrity brought to the job by each person associated with us.  Unyielding personal integrity and sound judgment is the foundation of corporate integrity.
>
> ***
>
> Obeying the law is the foundation of this Code.  Our success depends upon each employee, officer and director operating within legal guidelines and cooperating with local, national and international authorities.  We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

26.     The Code of Conduct discusses the importance of full, fair, accurate, timely and understandable disclosures and the obligation to report any violation of the securities laws:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account.  Therefore, our corporate and business records should be completed accurately and honestly.  The making of false or misleading entries is strictly prohibited.  Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others.  We also rely upon our accounting and other business and corporate records in preparing publicly filed reports.  ***Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations.***  Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent.  Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the [Audit Committee] or one of the other compliance resources described in Section 16.[3]

27.     The Code of Conduct requires fair dealing: "Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical

---

[3] All emphasis herein is added unless otherwise noted.

or illegal business practices.  Statements regarding the Company's services must not be untrue, misleading, deceptive or fraudulent."

## B.    Additional Duties Under The Corporate Governance Guidelines

28.    The Corporate Governance Guidelines detail additional obligations for Board members: "Directors must act with integrity and demonstrate a commitment to the Company, the Company's public benefit, values, and business, and long-term stockholder value."

## C.    Additional Duties Of Audit Committee Members

29.    The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, the Company's risk management practices and policies; the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; and the effectiveness and performance of the Company's internal audit function.

30.    The Audit Committee has additional powers and obligations, including:

- The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors.  The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

- The Committee will review and discuss with the Board, management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to … competition and regulation.  Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments … major financial risk exposures, the adequacy and effectiveness of … the internal controls regarding privacy and information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

- If an internal audit function is established and becomes operational, the Committee will review the audit plan of the Company's internal audit team and discuss with that team the adequacy and effectiveness of the Company's scope, staffing, and general audit approach.  The Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response.  The head of the internal auditors will also report to and be evaluated by the Committee.

- The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting, including the Company's information and cyber security systems, and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any significant deficiencies and/or material weaknesses.

- At least annually (if required by applicable Exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

**D.     Additional Duties of Sustainability, Nomination, And Governance Committee Members**

31.     The Charter of the Sustainability, Nomination, and Governance Committee sets forth additional duties for its members, including obligations relating to overseeing the development and adequacy of the Corporate Governance Guidelines, including periodically reviewing and assessing "the adequacy of the Company's corporate governance guidelines" and, as appropriate, recommending "any proposed changes to the Board for its consideration and approval."

**V.     SUBSTANTIVE ALLEGATIONS**

**A.     Background**

32.     Allbirds is a footwear and apparel company which produces simple, eco-friendly products. Allbirds' core products are lifestyle and athletic shoes, such as the Dasher and the Runner.

33.     On August 31, 2021, the Company filed with the SEC its Registration Statement on Form S-1 in connection with its IPO. After several amendments, the Registration Statement was declared effective on November 2, 2021 (the "IPO Registration Statement"). On November 4, 2021, the Company filed with the SEC its prospectus on Form 424B4 which was incorporated into the IPO Registration Statement (collectively, the "Offering Materials"). The Offering Materials were signed by Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan.

34.     In its IPO, the Company sold approximately 16,850, 700 shares of Class A common stock at a price of $15 per share, reaping proceeds of approximately $237 million.

**B.     The Individual Defendants Knew The Material Risks Regarding Allbirds' Core Operations**

35.     In the Offering Materials, Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan touted the Company's core strengths, including the ability to innovate and make new products while continuing to focus on the Company's core products.  Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan acknowledged their awareness of the materials risks in connection with the retention of existing customers and expansion of the customer base:

> Our success depends in large part upon widespread adoption of our products by our customers.  In order to attract new customers and continue to expand our customer base, we must appeal to and attract customers who identify with our sustainable footwear and apparel products.  If the number of people who are willing to purchase our products does not continue to increase, if we fail to deliver a high quality shopping experience, or if our current or potential future customers are not convinced that our products are superior to alternatives, then our ability to retain existing customers, acquire new customers, and grow our business may be harmed.
>
> ***
>
> If existing customers no longer find our products appealing, are not satisfied with our customer service, or if we are unable to timely update our products to meet current trends and customer demands, our existing customers may not make purchases, or if they do, they may make fewer or smaller purchases in the future.
>
> If we are unable to continue to attract new customers or our existing customers decrease their spending on the products we offer or fail to make repeat purchases of our products, our business, financial condition, results of operations, and growth prospects will be harmed.

36.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan acknowledged their awareness of the materials risks in connection with anticipating customer preferences and product trends:

> Our success depends on our ability to identify, originate, and define product trends within the footwear and apparel industry, as well as to anticipate, gauge, and react to changing consumer preferences in a timely manner…. If we are unable to introduce new products in a timely manner, or our new products are not accepted by our customers, our competitors may introduce similar products in a more timely fashion, which could hurt our goal to be viewed as a leader in comfortable and sustainable footwear and apparel.  All of our products are subject to changing consumer preferences regarding footwear and apparel, generally, and sustainable

10

footwear and apparel, specifically, that cannot be predicted with certainty. Our new products may not receive consumer acceptance as consumer preferences could shift rapidly to different types of styles and our future success depends in part on our ability to anticipate and respond to these changes…. If we fail to anticipate accurately and respond to trends and shifts in consumer preferences, we could experience lower sales, excess inventories, or lower profit margins, any of which could have an adverse effect on our results of operations and financial condition.

37.    Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan acknowledged their awareness of the materials risks in connection to the failure to accurately forecast customer demand and strategically invest in products:

To meet anticipated demand for our products, we must forecast inventory needs and place orders with our manufacturers based on our estimates of future demand for particular products. Our ability to accurately forecast demand for our products could be affected by many factors, including an increase or decrease in customer demand for our products or for products of our competitors, changing consumer preferences, changing product trends, our failure to accurately forecast consumer acceptance of new products…. If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale in our stores or for delivery to customers.

Inventory levels in excess of customer demand may result in inventory write-offs, donations by us of our unsold products, inventory write-downs, and/or the sale of excess inventory at discounted prices, any of which could cause our gross margin to suffer, impair the strength and exclusivity of our brand, and have an adverse effect on our results of operations, financial condition, and cash flows. For example, we have in the past donated excess unsold products to third parties and sold certain of our products at discounted prices at our outlet store in Northern California.

Conversely, if we underestimate customer demand for our products and fail to place sufficient orders with our manufacturers in advance, then our manufacturers may not be able to deliver products to meet our requirements and we may experience inventory shortages. Inventory shortages in our stores or third-party distribution centers could result in delayed shipments to customers, lost sales, a negative customer experience, lower brand loyalty, and damage to our reputation and customer relationships, any of which could have an adverse effect on our results of operations, financial condition, and cash flows.

## C.    The Company Represents It Actively Engages And Invests In Its Core Customer Base

38.    In the Offering Materials, Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan represented that Allbirds had a "deep connection" with customers:

By making great products and telling the story of an inspirational, purpose-driven brand, *we have formed a deep connection with our community of customers*. We have sold our products to over four million customers since our founding. As of June 30, 2021, we had more than two million people on our email list and nearly one million followers on social media. Our high Net Promoter Score, which has

consistently been 83 or higher since the first quarter of 2019 and was 86 for the first half of 2021, demonstrates our strong following and growing brand advocates who love Allbirds.  ***Approximately 53% of our net sales in 2020 came from repeat customers.***  This is true globally, as our customers span 35 countries, and 24% of our net revenue in 2020 came from outside the United States.

39.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan touted the Company's ability to "own the customer experience" and engage its customer base:

As a brand with a digitally-led vertical retail distribution strategy, we are able to own the customer experience, which allows us to use data to determine who our customers are, what is important to them, and what products are most relevant and when, allowing us to create a strong connection with our customers…. In addition to communicating more effectively with our customers, these insights allow us to meet customers' needs through the creation of new products and enhancements to our existing line.  Further, to illustrate the importance of engaging our customer base, the average spent by a repeat customer in a given cohort is over 25% more in their second year as compared to what was spent in the first year, and the average spend by a repeat customer continues to increase each subsequent year.

40.     Defendants Zwillinger, Blumenthal, Boyce, Brown, Fields, and Levitan represented that the Company was working to deepen its relationships with repeat customers and was well positioned to capture a greater market share of the apparel and footwear industry:

***By deepening our relationships with our repeat customers***, we believe we are well- positioned to capture a greater share of the approximately seven pairs of shoes and 68 pieces of clothing that the average American bought in 2018 and realize substantial growth in our business.  We believe there is continued opportunity to grow our closet share as we further expand our brand and product selection, as evidenced by the fact that approximately 80% of orders from repeat customers in the six-month period ended June 30, 2021, included a different item than in their first order and 26% of those orders were for multiple items.

41.     On November 30, 2021, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the third quarter 2021 financial results.  In the press release, Defendant Zwillinger stated:

We are pleased to deliver strong third quarter performance, which reflects solid execution by our teams and robust global demand for the Allbirds brand.  Revenue was strong across channels and geographies, growing 33% year over year, with notable strength in U.S. physical retail.  ***Importantly, we saw strong consumer response in the quarter to our new product innovation, including our new Perform Apparel line.***

We're at the forefront of a generational change in consumer values and purchase behaviors, led by our mission to make better things in a better way—which means we're aligning our purpose of reversing climate change with our product quality and financial outcomes.  ***Looking ahead, we believe Allbirds is uniquely positioned in an exceptionally large and growing market.***  As we continue to

execute our strategic plan, we are focused on accelerating growth, creating value for our shareholders and building for a multi-decade journey.

42.    On the same day, in a conference call with financial analysts and investors, Defendant Zwillinger stated that the Company made "strategic choices" in their R&D investments and distribution model which "helped to create important and structural advantages that we believe will allow us to outmaneuver competitors well into the future." Zwillinger represented that the Company was focused on repeat purchasers and touted the Company's repeat purchase rate of 43%. Defendant Brown emphasized the Company's ability to predict customer buying trends: "We have spent the last 5 years building a product platform that marries product innovation through natural materials and a purpose-driven brand that meets consumers where they are headed, not where they are."

43.    Chief Financial Officer ("CFO") Michael Bufano ("Bufano") responded to an analyst's question on inventory levels by emphasizing the Company's focus on its core products: "I would say if we were going to, we would probably really lean into our core products, core colors, core sizes, the stuff that we know there's a nice long tail on and long life on."

44.    On February 23, 2022, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the fourth quarter and full year 2021 financial results including a net loss of $45.4 million and an adjusted EBITDA loss of $11.7 million for the year. The Company also announced a net loss of $10.4 million for the fourth quarter of 2021. The Company provided guidance for 2022, including gross profit of $187.5–$195 million, representing a gross margin percent of 53.1%, and adjusted EBITDA of negative $13 million to negative $9 million, including an estimated $8 million of public company costs.

45.    On the same day, Allbirds held a conference call with financial analysts and investors to discuss the financial results for the fourth quarter and full year of 2021. On the call, Zwillinger stated that the Company was "laser-focused on generating meaningful and durable profitability and noted the "great progress" in 2021 "with adjusted EBITDA coming in ahead of our expectations for the fourth quarter and full year, continuing our disciplined march towards our long-term profitability targets."

46.     Defendant Zwillinger discussed the Company's decision to expand its wholesale distribution strategy, describing it as a continuation of the focus on the Company's core products:

> It's about 25% of the mix, and it's not something we take for granted that we're going to build that overnight.  And so showing up in the right places in front of the right consumers is something that's important.  But as we said, first of all, a couple of points to remind you of when you're thinking about this, Jim.  *One is that it's incremental to the core model.*  So meaning that additional sales and EBITDA are all going to be accretive to kind of the medium-term targets that we've set out there.
>
> And further, *we actually think that this will accelerate our ability to capture the demand in our core channels.*  So that halo, we've seen it before.  And I think it's kind of – it's something we can really bank on that, that should translate to great owned channel sales, and we're focused on a lot of execution there.

47.     On May 10, 2022, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the financial results for the first quarter 2022.  In the press release, Defendant Zwillinger was quoted, noting the "Company's excellent performance in our U.S. business" with "net revenue growth of 35% in the first quarter" and increased net revenue growth for the total business "on both a one- and two-year basis in the quarter, up 26% and 49%, respectively."  Zwillinger stated that the Company was "focused on driving the topline through our core growth pillars of delivering product innovation, growing our store portfolio and expanding internationally."  Zwillinger announced the Company's expectation of "strong full year revenue growth of 21% to 24% in 2022" with "our digital-savvy, omni-channel operating model" supporting continued growth and "meaningful value for our shareholders in the years ahead."

48.     On August 8, 2022, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the financial results for the second quarter 2022.  In the press release, Zwillinger touted the Company's ability to predict customer trends:

> Our data-rich business model allows us to quickly identify changes in consumer behavior….   As we continue to navigate this difficult environment, we have implemented Simplification Initiatives designed to generate cost of goods savings, streamline workflows, and lower operating costs.  The savings generated from these initiatives will allow us to continue to invest in our brand, our products, our customers, and our Flock, setting us up to continue to take share and keeping us on track to achieve our medium-term targets.

49.     In the press release, the Company announced the layoff of 8% of its global corporate workforce.  An Allbirds spokesperson stated that the layoffs followed an evaluation of

14

"roles and processes in each department, and in each market, to ensure our operating structure is set-up for the next phase of growth.  In this process, we looked for ways to streamline workflows, reduce duplicative efforts, and put past learnings and operational insights into practice."  The Company also announced that gross profit declined to $28.2 million from $38.1 million one year earlier, and that gross margin declined by 20% from the previous quarter primarily due to "non-cash write-down of inventory primarily related to certain first-generation apparel products, higher distribution center and logistics costs, lower mix of international sales, and unfavorable foreign exchange rates."

50.     On the same day, Allbirds held a conference call with financial analysts and investors to discuss the financial results.  Defendant Zwillinger touted the Company's business model and "direct relationship with customers": "One of the greatest advantages of our business model is that our sophisticated data platform and our direct relationship with our customer allows for rapid visibility into changes in demand signals."  Zwillinger stated that the Company was planning on expanding its product offering with the end goal of a "robust long-term pipeline":

> Within product, we will further enhance our emphasis on footwear products and innovation to expand our offering across lifestyle and performance footwear.  The highlight from the second quarter was our successful Tree Flyer launch and its unique midsole technology, SwiftFoam.  Tim will talk through what's on deck in the second half of the year, why we're excited about our recent materials innovation and how these enable a robust long-term pipeline.

51.     Zwillinger also touted the Company's "consumer-focused innovation" and ability to pivot to what was working with the customer base:

> I believe that one of the most important characteristics of an innovative company is the ability to quickly remind what is working and what misses the mark and having the agility and prudence to pivot accordingly.
>
> ***
>
> As a consumer-obsessed company we look to maintain a best-in-class NPS,[4] which we have continued to deliver.  We also focus on repeat purchase rate, which is strong at over 40%.  That lets us know that our customers love our products.

---

[4] Net Promoter Score (NPS) is a measure used to gauge customer loyalty, satisfaction, and enthusiasm with a company.

Similarly, we also track customer LTV,[5] which continues to grow as we provide new products that our customers love and offer them additional occasions to buy in our stores and, more recently, in our third-party partner stores.

These metrics demonstrate a best-in-class customer experience with a modern distribution model, all inside an enormous and growing addressable market, where we still have low double-digit awareness. Collectively, this gives us great confidence in our future potential. I firmly believe that the strength of our operating model will continue to propel us towards our medium-term financial and sustainability target, ***and we continue to win with consumers that we believe are increasingly aligned with the core tenets of the Allbirds brand.*** (Emphasis added).

52.    CFO Bufano emphasized the Company's new initiatives which were focused on "automating and expanding" the supply chain and "streamlining our operating structure," which would position the Company for "accelerated profitable growth":

In this operating environment, we are focused on controlling what we can control and have implemented a series of Simplification Initiatives focused on automating and expanding our supply chain and streamlining our operating structure. These Simplification Initiatives are expected to generate annualized SG&A expense savings of $13 million to $15 million beginning in 2023 and significant cost of revenue savings in future years. We will reinvest some of these savings into building brand momentum through product innovation, marketing, retail stores, and marquee third party partnerships. ***We are confident that these investments in the customer, coupled with our Simplification Initiatives, will help us navigate this consumer slowdown and position us for accelerated profitable growth*** when the headwinds pass.

53.    Zwillinger commented on the Company's discontinuation of its first-generation apparel products, packaging the write-down as a "focus on a simplified lineup of apparel that showcases the versatility of our natural materials." Defendant Brown discussed the liquidation of inventory in the context of the Company's "Simplification Initiatives":

There are nonrecurring costs associated with the Simplification Initiatives. We expect most of these to be incurred in 2022, but we'll keep investors updated on our progress. Let me walk you through our current estimates of those expenses.

One, we are liquidating end-of-life inventory, primarily first-generation apparel. We expect the nonrecurring net expense related to this liquidation to be $12 million to $14 million. The bulk of that expense already came through as a noncash charge of $11.6 million in Q2.

---

[5] Lifetime Value or LTV is an estimate of the average revenue that a customer will generate throughout their lifespan as a customer.

54.     Zwillinger responded to an analyst's question regarding the Company's repeat customers with assurances that the Company was investing in its core customers:

> [W]e're seeing absolutely no falloff in the number of repeat purchases that people are making.
>
> ***
>
> Even despite the fact of what we're seeing on the demand side, this isn't going to be a knee-jerk reaction to a downturn.  We're going to continue to invest not just in marketing as a line item but really specifically around brand and…we know we're aligned with what the customer wants, and we're going to double down.

55.     CFO Bufano stated that "we know we have the inventory in place to meet demand" and reassured that the Company's promotions would "help us move through inventory as well."

56.     Zwillinger described the "love that we're seeing from our customers" demonstrated "trough repeat purchase" which was "a testament to the strong health of the brand."

57.     On November 8, 2022, the Company filed with the SEC Current Report on Form 8-K attaching a press release announcing the financial results for the third quarter 2022.  In the press release, Defendant Zwillinger described a strong quarter of sustainable growth:

> We delivered a strong quarter in what remains a highly dynamic operating environment.  I am proud that we exceeded our Q3 adjusted revenue and adjusted EBITDA guidance targets while also delivering on our sustainability goals.  Looking ahead to year end and 2023, we continue to expect macro headwinds to persist but believe that our brand, our growth strategy, and simplification initiatives position us well to emerge strongly from this period.  Thanks to the team's hard work I remain confident in our ability to continue to execute into the holiday season and next year.

58.     On the same day, Allbirds held a conference call with financial analysts and investors to discuss the third-quarter financial results.  Defendant Zwillinger stated that the Company was on track to meet customer demand:

> [W]e feel really good about the balance that we're making in terms of meeting the consumer where they are for the moment, meeting the industry and still being best-in-class in terms of the premium nature of how we're approaching discounts and promotions.  So feeling generally pretty good about that, and it's all on track with what we kind of signaled to you all at the last quarterly call.

**D.    CFO Bufano Resigns And The Company Reports Dismal 2022 Financial Results**

59.    On March 9, 2023, the Company filed with the SEC a Current Report on Form 8-K attaching a press release announcing the resignation of CFO Michael Bufano and the appointment of a new CFO Annie Mitchell, effective April 24, 2023.  The Company announced that Bufano would remain with the Company through the transition period.

60.    The Company also attached a press release to the 8-K announcing the fourth quarter and full year 2022 financial results, including a net loss of $101.4 million for full year 2022 and an adjusted EBITDA loss of $60.4 million for the year.  Despite the Company's previous full year guidance of a gross profit of $187.5–$195 million, the Company's gross profit totaled $129.6 million compared to $146.7 million for the same period in 2021:

- Gross profit totaled $129.6 million compared to $146.7 million for the same period in 2021, while gross margin declined to 43.5% versus 52.9% in 2021. The decrease in gross margin is primarily due to the previously announced discontinuation of certain first-generation apparel, the impact of promotions, higher logistics costs, a lower mix of international sales, and unfavorable foreign exchange rates, partially offset by a higher mix of margin accretive retail store sales.

- Full year 2022 net loss of $101.4 million, or $0.68 per basic and diluted share.

- Fourth quarter 2022 net loss of $24.9 million, or $0.17 per basic and diluted share.

- Full year 2022 adjusted EBITDA loss of $60.4 million.

- Fourth quarter 2022 adjusted EBITDA loss of $12.5 million, including a $3.5 million loss primarily associated with the previously announced discontinuation of certain first-generation apparel.

-  Fourth quarter 2022 net revenue, which included $1.5 million of revenue primarily associated with the previously announced discontinuation of certain first-generation apparel, decreased 13% to $84.2 million compared to fourth quarter 2021 and increased 6% compared to fourth quarter 2020.

    (Footnotes omitted).

61.    The Company's net loss margin was 34.0% compared to 16.4% in 2021 and the adjusted EBITDA margin declined to negative 20.3% compared to negative 4.2% for 2021.  In the press release, Zwillinger stated: "2022…came to a challenging close, with results below our expectations due to both execution and macro challenges."

18

62.     In response to the negative financial results, the Company announced a transformation plan to "drive sustained and profitable growth," with a focus on several key transformation areas:

- Reignite product and brand.
  - o Executing a highly focused brand strategy that reconnects with core consumers.
- Optimize U.S. stores and slow pace of openings.
  - o Driving traffic and conversion to our U.S. fleet and selectively expanding our third-party wholesale channel.
- Evaluate transition of international go-to-market strategy.
  - o Evaluating potential distributor partners in certain international markets to grow internationally in a cost- and capital-efficient manner.
- Improve cost savings and capital efficiency.
  - o Building upon and further accelerating 2022 cost and cash optimization initiatives to accelerate cost of revenue savings and SG&A savings and improve cash optimization.

63.     On March 9, 2023, the Company held a conference call with financial analysts and investors to discuss the year-end 2022 financial results.   On the call, Defendant Zwillinger admitted that the Company had made "some missteps," including overemphasizing non-core products and underinvesting in the Company's core products:

> However, in this journey we also made some missteps.  First, ***we overemphasized products that extended beyond our core DNA***.  And as a result, some products and colors have had narrower appeal than expected.  Because we were spending significant time and resources on these new products that did not resonate well, ***we underinvested in our core consumers' favorite products.***  Finally, we did not increase our brand awareness to the level that we anticipated.
>
> In essence, over the past couple of years, we shifted our focus away from our core consumer and we must refocus sharply on this large and attract [sic] group.  Taking a look at Q4 specifically this dynamic was exacerbated by the fact that the final weeks of December were exceptionally promotional and we did not sufficiently promote to meet consumers' expectations.  As a result, Q4 was the first quarter of negative growth in our history.  We are disappointed with these results.  And we know that, as we look ahead the status quo is not enough.  (Emphasis added).

64.     Defendant Zwillinger discussed the Company's transformation plan, including an initiative to reconnect "with our core consumer" and drive "brand momentum through product and marketing."  Zwillinger acknowledged that the Company "over-invested in seasonal trend colors and new silhouettes like the Pacer and Flyer and had "yet to commercialize them effectively."

According to Zwillinger, the Company had come to realize its mistake of "overinvestment on newness" which "came at the expense of focus on consumers, who are loyal to our brands and on nurturing our core franchises, such as the Runner and Dasher."

65.    Bufano stated that in light of the transformation and SEC guidance, the Company was adjusting its accounting metrics and consequently its guidance:

> Also, in light of the strategic transformation and in order to align with these expressed by members of the staff of the SEC following the receipt of a routine comment letter in December, we are no longer excluding from our non-GAAP measures the revenue and cost of revenue associated with the previously announced discontinuation of our first-generation apparel business.  Our guidance targets for Q4 net revenue and adjusted EBITDA loss did exclude these items.  The impact of this change, compared to our guidance targets, was an increase to Q4 revenue of $1.5 million, a decrease to Q4 gross profit of $3.5 million and an increase to Q4 adjusted EBITDA loss of $3.5 million.

66.    CFO Bufano also disclosed "weaker than expected new customer acquisition and repeat purchase behavior, which resulted in an 11% decrease in active customers."

67.    On the call, Defendant Brown highlighted the transformation plan as a "fresh look at how we deliver on our commitment to develop premium, differentiated and sustainably built products *so that we can better connect with our core consumer and reignite growth*."

68.    Defendant Zwillinger admitted that the Company failed to execute well following the launch of the Dasher:

> We just found out that the customers that … are in our sweet spot aren't resonating with a core technical performance messaging.  And some of that missed execution by us, I think, boils down to us having a little bit of difficulty with signal and noise as we launched the Dasher and saw really tremendous success.

69.    An analyst wondered if the need to quickly liquidate inventory would affect the core brand.  Defendant Zwillinger reassured that the Company was "making sure that we protect the core" which would be a "continued strategy" and "thoughtful and measured," despite the Company's failure to execute on such a strategy up until that point.

70.    On the heels of the disappointing financial news and the announcement of the transformation plan, the Company's stock price fell by 47% from the previous day's close of $2.36

per share to $1.25 per share on March 10, 2023.  The Company's stock price has fallen more than 90% from its $15.00 per share IPO price.

71.     On March 10, 2023, the Company filed with the SEC its Annual Report on Form 10-K, which was signed by all of the Individual Defendants.  In the 10-K, the Individual Defendants reported huge losses for the year and an accumulated deficit of $238.7 million: "We incurred net losses of $101.4 million, $45.4 million and $25.9 million in in 2022, 2021 and 2020, respectively, and we had an accumulated deficit of $238.7 million as of December 31, 2022.  We expect to continue to incur significant losses in the future."

72.     On May 10, 2023, the Company filed with the SEC its Quarterly Report on Form 10-Q and announced another round of layoffs, cutting 9% of its U.S. corporate staff.

**E.     Allbirds Is Sued In Securities Class Action Lawsuits**

73.     On April 13, 2023, a securities class action lawsuit was filed in the United States District Court for the Northern District of California captioned, *Shnayder v. Allbirds, Inc., et al.*, No. 3:23-cv-01811-AMO (N.D. Cal.) against the Company, Defendants Zwillinger, Brown, Blumenthal, Boyce, Fields, and Levitan, former Allbirds directors Emily Weiss and Nancy Green, former CFO Bufano, and the underwriters of the Company's IPO, alleging violations of  Sections 11 and 15 of the Securities Act of 1933, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC,  and  Section 20(a) of the Exchange Act (the "*Shnayder* Action").  The lawsuit seeks damages on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Allbirds Class A common stock pursuant or traceable to the Offering Materials or Allbirds securities between November 4, 2021, and March 9, 2023, inclusive.  The lawsuit  alleges that the defendants failed to disclose to investors that: (i) Allbirds was overemphasizing products that extended beyond the Company's core offerings; (ii) the Company's non-core products had a narrower appeal and were not resonating with customers as well as the Company's core products; (iii) Allbirds was underinvesting in its core consumers' favorite products to push the Company's newer products with narrower appeal; (iv) underinvesting in Allbirds' core products was negatively impacting the Company's sales; and (v) that, as a result

of the foregoing, defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and lacked a reasonable basis.

74.     On May 16, 2023, another securities class action lawsuit was filed in the United States District Court for the Northern District of California captioned, *Delgado Jr. v. Allbirds, Inc., et al.*, No. 3:23-cv-02372-AMO (N.D. Cal.) against the Company, Defendants Zwillinger, Brown, Blumenthal, Boyce, Fields, and Levitan, former Allbirds directors Emily Weiss and Nancy Green, and former CFO Bufano, alleging violations of Sections 11 and 15 of the Securities Act of 1933, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act.  The lawsuit seeks damages on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Allbirds Class A common stock pursuant or traceable to the Offering Materials or Allbirds securities between November 4, 2021, and March 9, 2023, inclusive.

75.     On July 28, 2023, the two securities cases were consolidated under the caption for the *Shnayder* Action.

**F.     Allbirds' False And Misleading Proxy Statement**

76.     On April 27, 2023, the Company filed its 2023 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect Defendants Zwillinger and Levitan to the Board.  The Proxy Statement was authorized by the Board and signed by Defendants Zwillinger and Brown.

77.     The 2023 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> Our Board of Directors oversees our risk management processes.  In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company.  The Board has overall responsibility for evaluating key business risks faced by the Company, including but not limited to privacy, technology, information security (including cyber security and back-up of information systems), competition, and regulation.  The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board standing committees that address risks inherent in their respective areas of oversight.

78.     The 2023 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company, the adequacy of the Company's internal controls, and compliance with all legal and regulatory requirements.  For example, the Proxy lists the following specific responsibility of the Audit Committee, among others:

- overseeing the Company's accounting and financial reporting processes, systems of internal control, financial statement audits, and the integrity of the Company's financial statements;

- reviewing any reports or disclosures required by applicable law and listing requirements of any stock exchange on which the Company's securities are listed;

- overseeing the design, implementation, organization, and performance of the Company's internal audit function; and

- helping the Board oversee the Company's privacy and information security policies and legal and regulatory compliance, including risk assessment.

79.     The 2023 Proxy Statement represents that the Sustainability, Nomination, and Governance Committee reviews and assesses "the adequacy of the Company's corporate governance guidelines" and, as appropriate, recommends "any proposed changes to the Board for its consideration and approval."

80.     The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

81.     On June 13, 2023, Allbirds filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Zwillinger and Levitan to the Board pursuant to the solicitations in the 2023 Proxy Statement.

1  **VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

2       82.     Plaintiff brings this action derivatively and for the benefit of Allbirds to redress

3  injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

4  fiduciary duties as directors and officers of Allbirds, and violations of Section 14(a) of the

5  Exchange Act, contribution for violations of 21D of the Exchange Act, as well as the aiding and

6  abetting thereof.

7       83.     Allbirds is named solely as a nominal party in this action.  This is not a collusive

8  action to confer jurisdiction on this Court that it would not otherwise have.

9       84.     Plaintiff is, and has been at all relevant times, a stockholder of Allbirds and was a

10  stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately

11  and fairly represent the interests of Allbirds in enforcing and prosecuting its rights, and, to that

12  end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

13      85.     Demand upon the Board to institute this action against the Individual Defendants

14  would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

15      **A.    Demand Upon Defendant Zwillinger Is Excused**

16      86.     Zwillinger is the Co-Founder of Allbirds, Allbirds CEO since May 4, 2023, and

17  President and an Allbirds director since the Company's inception. Zwillinger also served as Co-

18  CEO from October 2015 until May 4, 2023.  Zwillinger therefore is not independent.  Indeed,

19  Allbirds' 2023 Proxy Statement does not list Zwillinger as an independent director.

20      87.     As an employee of Allbirds, the Company provides Defendant Zwillinger with his

21  principal occupation from which he receives substantial compensation, including $4,449,210 in

22  2022.  Thus, Zwillinger could not consider a demand for action that might require him to sue the

23  directors who control his continued employment or fellow members of management with whom

24  he works on a day-to-day basis.

25      88.     Zwillinger is named as a defendant in the pending Securities Class Actions.  As

26  such, he is incapable of considering a demand to commence and vigorously prosecute this action

27  with the required independence and disinterest.

28                                                24

89.     Zwillinger and Brown have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner.  Allbirds is the brain child of Defendant Brown but Brown needed a partner with experience establishing a supply chain to move his idea forward.[6]  Brown chose Zwillinger, an industrial engineer and a Wharton graduate, who was running a chemicals business unit of a biotech company.[7]  Zwillinger's wife and Brown's wife are best friends who roomed together in college at Dartmouth, and Zwillinger was among the early investors in Brown's original Kickstarter campaign for Allbirds.[8]  The two, first introduced by their wives, walked the California hills "for three days and coalesced a partnership that would be bigger than the individual pieces," according to Zwillinger.[9]

90.     Zwillinger and Blumenthal have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner.  Zwillinger and Blumenthal were best friends from their days at the Wharton School of the University of Pennsylvania ("Wharton").[10]  Zwillinger's Wharton network, including Blumenthal as the Co-CEO of Warby Parker, supported Brown and Zwillinger in the early days of Allbirds by connecting the pair to investors and innovators.[11]  Zwillinger touted the support of his Wharton friends, such as Blumenthal: "Some of my best friends from Wharton have been some of my best

---

[6] Tom Huddleston Jr., CNBC, *How Allbirds went from Silicon Valley Fashion Staple to a $1.4 Billion Sneaker Start-Up*; https://www.cnbc.com/2018/12/14/allbirds-went-from-silicon-valley-staple-to-billion-sneaker-startup.html (Dec. 18, 2018).

[7] *Id.*

[8] *Id.*

[9] *The Pennsylvania Gazette*, https://thepenngazette.com/threading-lightly/ (August 18, 2021).

[10] Christine Speer Lejeune, *Wharton Magazine, Start Me Up*, https://magazine.wharton.upenn.edu/issues/spring-summer-2020/start-me-up/ (Spring/Summer 2020).

[11] *Id.*

allies in business."[12]  Zwillinger and Blumenthal created a venture capital fund, Good Friends, with two other Wharton classmates to address the climate crisis, and the fund has made more than sixty investments in various companies.[13]  Zwillinger jokes that Wharton "was pretty good to me. I got a wife and through her found a business partner.  I got great friends who support me in my business endeavors and invest with me."[14]

91.      Zwillinger signed the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

92.      Zwillinger benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Allbirds Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

93.      Zwillinger, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

94.      Zwillinger is neither independent nor disinterested.  Any demand upon Defendant Zwillinger is futile and, thus, excused.

**B.      Demand Upon Defendant Blumenthal Is Excused**

95.      Blumenthal is named as a defendant in the pending Securities Class Actions.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

---

[12] *Id.*

[13] *The Pennsylvania Gazette*, https://thepenngazette.com/threading-lightly/ (August 18, 2021).

[14] *Id.*

96.     Blumenthal and Zwillinger have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Blumenthal and Zwillinger were best friends from their days at Wharton. Zwillinger's Wharton network, including Blumenthal as the Co-CEO of Warby Parker, supported Brown and Zwillinger in the early days of Allbirds by connecting the pair to investors and innovators.  Zwillinger touted the support of his Wharton friends, such as Blumenthal: "Some of my best friends from Wharton have been some of my best allies in business."  Blumenthal and Zwillinger created a venture capital fund, Good Friends, with two other Wharton classmates to address the climate crisis, and the fund has made more than sixty investments in various companies.

97.     Blumenthal authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

98.     Blumenthal, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

99.     Blumenthal is neither independent nor disinterested.  Any demand upon Defendant Blumenthal is futile and, thus, excused.

### C.    Demand Upon Defendant Boyce Is Excused

100.    Boyce is named as a defendant in the pending Securities Class Actions.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

101.    Boyce authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

102.     Boyce, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds' compliance with relevant laws, rules, and regulations. Boyce utterly failed to perform these essential duties.

103.     Boyce, as Chair of the Sustainability, Nomination, and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Allbirds' Corporate Governance Principles.  Boyce utterly failed to perform these duties.

104.     Boyce, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

105.     Boyce is neither independent nor disinterested.   Any demand upon Defendant Boyce is futile and, thus, excused.

**D.     Demand Upon Defendant Brown Is Excused**

106.     Defendant Brown is the Company's Co-Founder and Chief Innovation Officer since May 4, 2023.  Brown served as Co- CEO from October 2015 until May 4, 2023, and an Allbirds director since May 2015.  Brown therefore is not independent.  Indeed, Allbirds' 2023 Proxy Statement does not list Brown as an independent director.

107.     Brown is named as a defendant in the pending Securities Class Actions.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

108.     Defendants Brown and Zwillinger have a long-standing business and personal relationship, which precludes them from acting in an independent and disinterested manner. Allbirds is the brainchild of Defendant Brown, but Brown needed a partner with experience establishing a supply chain to move his idea forward.  Brown chose Zwillinger, an industrial engineer and a Wharton graduate, who was running a chemicals business unit of a biotech

company.  Zwillinger's wife and Brown's wife are best friends who roomed together in college at Dartmouth, and Zwillinger was among the early investors in Brown's original Kickstarter campaign for Allbirds.  The two men, first introduced by their wives, walked the California hills "for three days and coalesced a partnership that would be bigger than the individual pieces," according to Zwillinger.

109.    Brown signed the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

110.    Brown, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

111.    Brown is neither independent nor disinterested.  Any demand upon Defendant Brown is futile and, thus, excused.

**E.    Demand Upon Defendant Fields Is Excused**

112.    Fields is named as a defendant in the pending Securities Class Actions.  As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

113.    Fields authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefore.

114.    Fields, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds' compliance with relevant laws, rules, and regulations.  Fields utterly failed to perform these essential duties.

115.    Fields, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate,

and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

116.    Fields is neither independent nor disinterested.  Any demand upon Defendant Fields is futile and, thus, excused.

**F.    Demand Upon Defendant Levitan Is Excused**

117.    Levitan is named as a defendant in the pending Securities Class Actions.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

118.    Levitan is a Managing Member of Maveron LLC, a venture capital firm, which he co-founded in January 1998.  Maveron, beneficially owns 16,824,330 Allbird Class B shares, with voting control over approximately 26.9% of the outstanding Allbird common stock.  As an early investor in the Company, Maveron led a Series A fundraising round for Allbirds which raised $7.25 million in 2016.[15]  Maveron was Allbird's largest shareholder before the Company's IPO with a stake worth around $400 million based on the Company's opening stock price.[16]

119.    Levitan authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

120.    Levitan benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Allbirds Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

121.    Levitan, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Allbirds' compliance with relevant laws, rules, and regulations. Levitan utterly failed to perform these essential duties.

---

[15] *Fashion*, https://us.fashionnetwork.com/news/Allbirds-secures-7-25m-series-a-round-new-colours-announced,729686.html (Sept. 8. 2016).

[16] Taylor Soper, *GeekWire, https://www.geekwire.com/2021/allbirds-secret-sauce-early-investor-reflects-shoe-companys-success-goes-public/* (Nov. 3, 2021).

122.    Levitan, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

123.    Levitan is neither independent nor disinterested.  Any demand upon Defendant Levitan is futile and, thus, excused.

**G.      Demand Upon Defendant Freeman Is Excused**

124.    Freeman authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

125.    Freeman, as a member of the Sustainability, Nomination, and Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Allbirds' Corporate Governance Principles.  Freeman utterly failed to perform these duties.

126.    Freeman, as a director of Allbirds, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

127.    Freeman is neither independent nor disinterested.  Any demand upon Defendant Freeman is futile and, thus, excused.

**H.      Other Factors Demonstrating That Demand Upon The Allbirds Board Is Excused**

128.    Allbirds has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

129.     The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

130.     Publicly traded companies, such as Allbirds, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Allbirds' damages.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE
#### Against the Individual Defendants for
#### Violations of Section 14(A) of the Exchange Act

131.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

132.     The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

133.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

134.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

135.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that the Individual Defendants each violated their fiduciary duties to Allbirds and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the Proxy Statement contained false and misleading statements related to risk oversight by the Board and responsibilities of the Audit Committee and Sustainability, Nomination, and Governance Committee.

136.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading and omitted material information.

137.    The false and misleading statements in, and information omitted from, the 2023 Proxy Statement were material to Allbirds' shareholders in determining whether to, among other things, elect Defendants Zwillinger and Levitan to the Board.

138.    The material misstatements and omissions in the Proxy Statement damaged the Company.

139.    Plaintiff, on behalf of Allbirds, seeks relief for damages inflicted upon the Company based on the misleading 2023 Proxy Statement in connection with the improper election of Defendants Zwillinger and Levitan.

**COUNT TWO**
**Against the Individual Defendants**
**for Breach of Fiduciary Duties**

140.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

141.    The Individual Defendants owed and owe fiduciary duties to Allbirds.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Allbirds the highest obligation of good faith and loyalty in the administration of Allbirds' affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Allbirds alleged herein.

142.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

143.    The Individual Defendants each violated their fiduciary duties to Allbirds and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Allbirds' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Allbirds has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

144.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff on behalf of Allbirds has no adequate remedy at law.

**COUNT THREE**
**Against the Individual Defendants**
**for Contribution for Violations of 21D of the Exchange Act**

145.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

146.    Allbirds is named as a defendant in related securities class action lawsuits that allege and assert claims arising under the federal securities laws.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Allbirds is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct.  The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

147.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Allbirds' general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

148.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

149.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT FOUR**
**Against the Individual Defendants**
**for Aiding and Abetting**

150.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

151.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

152.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

153.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

154.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

VIII.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Allbirds and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Sections 14(a) and 21D of the Exchange Act;

(c)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Allbirds;

(d)    Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight and monitoring;

(e)     Determining and awarding to Allbirds the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)     Awarding Allbirds restitution from the Individual Defendants, and each of them;

(h)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i)     Granting such other and further relief as the Court may deem just and proper.

**IX.     JURY DEMAND**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: August 24, 2023

OF COUNSEL:

**WEISS LAW**
David C. Katz
Mark D. Smilow
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com

        -and-

Joshua M. Rubin
Jonathan Meer
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com
        jmeer@weisslawllp.com

**WEISS LAW**

By: _/s/ Joel E. Elkins_
Joel E. Elkins (SBN 256020)
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: (310) 208-2800
Facsimile:  (310) 209-2348
Email: jelkins@weisslawllp.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Barbara Wolfson, hereby verify that I have held stock in Allbirds, Inc. ("Allbirds" or the "Company") since the Company's initial public offering. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"). I am ready, willing, and able to pursue this stockholder derivative action on behalf of Allbirds. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

*Barbara Wolfson*

Barbara Wolfson (Aug 22, 2023 18:19 EDT)

Barbara Wolfson